1

2

3

4

5

6

7

8                     IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   PAUL MAGNAN,

11              Plaintiff,               No. CIV S-03-1099 GEB KJM P

12        vs.

13   DAVID RUNNELS, et al.,

14              Defendants.           FINDINGS & RECOMMENDATIONS

15   _____/

16              Plaintiff is a former California prisoner proceeding with counsel with an action for

17   violation of civil rights under 42 U.S.C. § 1983.  Defendant Evans (defendant) is a former

18   employee of the California Department of Corrections and Rehabilitation (CDCR), who worked

19   as Associate Warden at High Desert State Prison.  Defendant's motion for summary judgment is

20   before the court.[1]

21   /////

22   /////

23   /////

24

25        [1] Defendant Runnels originally joined in the motion, but he was dismissed by stipulation
     on June 24, 2010.  Defendant Briddle also has filed a motion for summary judgment, which is
26   addressed in separate findings and recommendations.

I. Summary Judgment Standard

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party
> always bears the initial responsibility of informing the district court
> of the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions
> on file, together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party

1   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

2   of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

3   (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

4   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

5   return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

6   1436 (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.

7   2d 1564, 1575 (9th Cir. 1990).

8          In the endeavor to establish the existence of a factual dispute, the opposing party

9   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

10   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

11   versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

12   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

13   genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

14   committee's note on 1963 amendments).

15          In resolving the summary judgment motion, the court examines the pleadings,

16   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

17   any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

18   477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

19   court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

20   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

21   produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

22   Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

23   1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

24   show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

25   as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

26   'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

II. Plaintiff's Allegations

In his first cause of action, plaintiff alleges defendant violated plaintiff's Eighth Amendment rights by failing to protect plaintiff from attack by other inmates. While defendant seeks summary judgment with respect to all claims in plaintiff's third amended complaint, plaintiff does not oppose summary judgment being entered with respect to any claim other than his first cause of action. Opp'n at 1.[2]

Plaintiff makes the following factual allegations in his June 1, 2006 third amended complaint, which is not verified, in support of his first cause of action against defendant. At all times relevant, plaintiff was incarcerated at High Desert State Prison. On February 15, 2002, a riot occurred between African-American and white inmates on the exercise yard of the facility where plaintiff was housed at the time, B-Facility. A large number of prisoners were injured, most of them white. More than 100 inmates participated in the riot. Following the riot, the facility where the riot occurred was placed on lockdown. Plaintiff, who is white, did not participate in the riot. The fact that plaintiff did not participate in the riot made him a "marked man" by other whites, including members of the white gang known as the "Aryan Brotherhood" (AB), and defendant was aware of this. On April 10, 2002, another riot occurred on the B-Facility exercise yard. Again, plaintiff did not participate.

About six weeks later, on May 31, 2002, an inmate named McCormick, who was a member of a white supremacist gang associated with the AB, was found in possession of a "hit list" on which plaintiff's name appeared. The list also contained names of other inmates who were on the B-Facility exercise yard on April 10, 2002 when the riot occurred, but did not participate. When the threat became known to correctional staff, McCormick was placed in Administrative Segregation (Ad Seg). Plaintiff also was placed in Ad Seg for his own safety.
/////

---

[2] Plaintiff's counsel confirmed at hearing that plaintiff opposes summary judgment as to the first cause of action only.

1        On June 20, 2002, plaintiff appeared before an Institution Classification

2   Committee (ICC) consisting of defendant and Correctional Officers Briddle, Baughman[3] and

3   Nolan for a determination of where plaintiff should be housed.  At the hearing, plaintiff had to

4   correct defendant's initial understanding that plaintiff had participated in the April 10 riot, when

5   he had been cleared of that charge.  The officers were aware of inmate McCormick's "hit list."

6   Despite this, Officer Briddle said plaintiff would be assigned to exercise on Ad Seg Closed

7   Compatible Yard Four, which was the same yard where inmates who were found to have

8   participated in the February 15, 2002 riot exercised.  Although Officer Baughman questioned the

9   wisdom of this decision, the committee confirmed it.

10        On June 22, 2002, plaintiff was taken to Closed Compatible Yard Four for

11   exercise.  When he arrived, he saw twenty-five white inmates, all of whom had been participants

12   in the April 10th riot on B-yard.  Plaintiff was attacked and knocked unconscious by some of

13   those inmates.  His cellmate, Michael Holtsinger, was attacked as well.  Plaintiff suffered severe

14   acute injuries as a result of the attack, and suffers permanent injury as well.

15        On June 27, 2002, plaintiff reappeared before the ICC, consisting of the same four

16   officers, including defendant.  One officer apologized to plaintiff saying they had made a "big

17   mistake," while defendant nodded in agreement.

18   /////

19   /////

20   /////

---

22   [3]  Baughman was a defendant in this action until Baughman and plaintiff stipulated on
June 10, 2010, to dismissal with prejudice of the claims against Baughman under Rule
23   41(a)(A)(ii) of the Federal Rules of Civil Procedure.  At oral argument, counsel for defendant
Evans questioned why plaintiff agreed to dismiss Baughman and not Evans, believing the
24   allegations against both defendants and the facts underlying plaintiff's claims against them are
essentially the same.  See also Request for Judicial Notice (Docket No. 180).  Later in the
25   hearing, plaintiff asserted Baughman was simply the "recorder" for the June 20, 2002 ICC
hearing.  In any event, plaintiff's agreement to dismiss defendant Baughman has no relevance to
26   the instant motion.  A plaintiff may agree to dismiss a defendant pursuant to Rule 41 for any
reason, and nothing in the record provides the reasons for Baughman's dismissal.

1    Plaintiff alleges defendant failed to protect plaintiff from violence in violation of

2 the Eighth Amendment specifically by participating in the decision to assign plaintiff to Closed

3 Compatible Yard Four on June 20, 2002.  See Third Am. Compl. ¶¶ 20-43, 64-70.

4 III.  Failure To Protect Standards

5    The Eighth Amendment's prohibition of cruel and unusual punishment imposes

6 on prison officials, among other things, a duty to "take reasonable measures to guarantee the

7 safety of the inmates."  Farmer v. Brennan, 511 U.S. 825, 832 (1991) (quoting Hudson v. Palmer,

8 468 U.S. 517, 526-27 (1984)).  An inmate's Eighth Amendment rights can only be violated by a

9 prison official if that official exposes an inmate to a "substantial risk of serious harm," while

10 displaying "deliberate indifference" to that risk.  Id. at 834.  An official is deliberately indifferent

11 if he or she "knows of and disregards an excessive risk to inmate health or safety; the official

12 must both be aware of facts from which the inference could be drawn that a substantial risk of

13 serious harm exists, and he must also draw the inference."  Id. at 837.

14    In the context of failure to protect an inmate from a known threat to safety,

15 deliberate indifference does not require an express intent to punish.  Berg v. Kincheloe, 794 F.2d

16 457, 459 (9th Cir. 1986).  The standard also does not require that the official believe "to a moral

17 certainty that one inmate intends to attack another at a given place at a time certain before that

18 officer is obligated to take steps to prevent such an assault.  But, on the other hand, he must have

19 more than a mere suspicion that an attack will occur."  Id.  A prison official cannot be liable

20 under the Constitution for mere negligence.  Davidson v. Cannon, 474 U.S. 344, 347 (1986).   In

21 order to avoid a finding of deliberate indifference, prison officials might show, for example,

22    that they did not know of the underlying facts indicating a
     sufficiently substantial danger and that they were therefore
23    unaware of a danger, or that they knew the underlying facts but
     believed (albeit unsoundly) that the risk to which the facts gave rise
24    was insubstantial or nonexistent.

25 Farmer, 511 U.S. at 844.

26 /////

6

1   IV.  Factual Record

2          Defendant argues he should be granted summary judgment because his

3   participation in the June 20, 2002 decision to assign plaintiff to Closed Compatible Yard Four

4   did not amount to deliberate indifference to a substantial risk of serious harm.  Defendant avers

5   he believed plaintiff's safety would have been in jeopardy if plaintiff had remained on B-yard

6   because there was information contained in a confidential memorandum that certain specifically

7   identified B-yard inmates would attack plaintiff.  Decl. of Michael Evans in Supp. Summ. J.

8   (Evans Decl.) ¶¶ 26-29, Exs. A & B.  Defendant also says when plaintiff was placed on Closed

9   Compatible Yard Four, he believed there were no inmates there who had been specifically

10  identified as a threat to plaintiff.  Id. ¶¶ 30-31.

11         As noted, plaintiff alleges defendant was deliberately indifferent to a substantial

12  risk of harm by assigning plaintiff to Closed Compatible Yard Four because defendant knew that

13  yard included inmates who had participated in the then-recent race riots who would likely attack

14  plaintiff because he did not participate.  The evidence before the court concerning this claim and

15  the defense is as follows.[4]

16         According to defendant, the history of riots at High Desert dated back to February

17  2001.  Id. ¶ 15.  A first riot between black inmates and Southern Hispanic inmates was initiated

18  by the black inmates.  Id.  A second riot occurred in May 2001 and again involved Southern

19  Hispanic inmates and black inmates.  Id. ¶ 17.  This riot was initiated by the Southern Hispanics

20  as retribution for the earlier riot.  Id.  A third riot occurred in February 2002 on the exercise yard

21  for B-facility.  Id. ¶ 19.  The riot involved white and black inmates.  Id.  The last riot prior to the

22  incident underlying plaintiff's claim occurred on April 10, 2002 and involved approximately 80

23  /////

24  ─────────────────

25         [4]  The court relies only on evidence that satisfies standards of admissibility, and so
    disregards evidence for which foundation is lacking or which is otherwise objectionable.  To the
    extent evidence offered by plaintiff is not cited here, defendant's objections to that evidence are
26  sustained.

1   white and black inmates.  Id. ¶ 20.  With the exception of about six inmates, all inmates on the

2   yard participated in the riot.  Id.

3           Plaintiff avers that inmates learned who did not participate in the April 10 riot

4   because of the manner in which disciplinary hearings following the riot were held:

5           When the day came for the hearings to be held for the white
            inmates, groups of 4 or more inmates were chained together and
6           brought down to the Facility B operations center, and a group of
            approximately 20 inmates was held outside the Lieutenant's office,
7           which had windows through which all of the inmates could
            observe the hearings, and inmates closest to the door could hear
8           what was being said in the office and announced what was
            occurring in the hearings and some inmates announced whether
9           they were found guilty upon emerging from the hearing, so that all
            inmates knew what the results of the hearing were.

10

11  Decl. of Paul Magnan in Opp'n to Mot. for Summ. J. (Magnan Decl.) ¶¶ 32-32A.

12          On June 14, 2002, plaintiff was placed in Ad Seg, a placement confirmed on June

13  17, 2002 by Captain Briddle.  Evans Decl., Ex. A.  Briddle informed plaintiff that the reason for

14  the placement was that "Facility B white inmates had conspired to stab" plaintiff.  Magnan Decl.

15  ¶¶ 38, 43-44.  On or about June 14, 2002, plaintiff walked with inmates Fowler, Cable and

16  Holtsinger to Ad Seg.  Id. ¶ 39.  The correctional officer escorting the inmates predicted that two

17  of the four inmates on the escort would be stabbed.  Id.

18          Defendant was the chairman of the June 20, 2002 ICC proceedings that resulted in

19  plaintiff's being indefinitely assigned that day to Closed Compatible Yard Four, which defendant

20  refers to as "D7-CC4."  Evans Decl. ¶¶ 10, 22, 25-26.  As chairman, defendant could override

21  any final decision of the ICC.  Id. ¶ 10.  Although defendant does not recall the details of

22  plaintiff's hearing, it was his practice to review all of an inmate's prison records in connection

23  with an ICC hearing.  Id. ¶ 12.  It was also defendant's practice to allow the inmate to speak at a

24  hearing, id. ¶ 13, and to inform the inmate if there were any known threats to his safety, id. ¶ 14.

25  In defendant's experience generally, even if an inmate knew he was at risk, he often would not

26  /////

8

1   admit it to correctional staff in an ICC hearing.  Id. ¶ 24.  Defendant says all details of an ICC

2   hearing would normally be recorded on a CDC 128(G) form.  Id. ¶ 10.

3   Plaintiff avers that at the June 20, 2002 ICC proceedings, defendant began by

4   noting incorrectly that plaintiff had been found guilty of participating in the April 10, 2002 riot

5   and, as a result, he was going to be sent to the Pelican Bay State Prison Security Housing Unit

6   and assessed a 10 point increase in his classification score.  Magnan Decl. ¶ 45; see also Evans

7   Decl., Ex. C (plaintiff's classification score identified at top as 68, reflecting an anticipated ten

8   point increase) and compare id. (reference to 58 point score actually assigned, at end of narrative

9   discussion).  Committee member Baughman searched plaintiff's file and found documentation

10  that plaintiff had not been found guilty of rioting, which Briddle then confirmed.  Magnan Decl.

11  ¶¶ 47-48.  Baughman then passed around a "confidential folder" to the members of the ICC.  Id.

12  ¶ 48.

13  At some point during the hearing, defendant reviewed the confidential

14  memorandum, dated May 31, 2002, which identified eight inmates as saying they would stab all

15  black inmates and any "no good" white inmates if they got the chance.  Evans Decl. ¶ 26, Exs. A,

16  B; Magnan Decl. ¶ 48.  Plaintiff is listed in the memorandum as one of the inmates targeted for

17  attack.  Defendant does not specifically remember whether he shared the contents of the

18  memorandum or the nature of the threat to plaintiff's safety with plaintiff.  Evans Decl. ¶ 32.

19  While plaintiff expressed no concerns for his safety at the hearing, plaintiff asserts

20  he had no reason for concern because he was not made aware of anything suggesting he was in

21  danger including that he was on a "hit list"prepared by inmate McCormick.  Magnan Decl. ¶¶ 34,

22  51, 53, 69.  Plaintiff only learned he was on the "hit list" through a "kite" he received from an

23  unidentified inmate after June 22.  Id.; Deposition of Paul Magnan (Magnan Depo.) at 108:8-

24  110:2.

25  Defendant says no other ICC member expressed doubt about whether plaintiff

26  should be assigned to D7-CC4.  Evans Decl. ¶ 38.  Plaintiff, however, says committee member

1  Baughman exclaimed to Briddle, who had said plaintiff would be given the same housing

2  assignment as inmate Holtsinger, "Are you sure – I don't want to get sued and lose my house."

3  Magnan Decl. ¶ 49.   Briddle then said, "It's okay, he's one of them." Id.

4         In his declaration, defendant asserts that D7-CC4 was created for inmates from B

5  facility who required administrative segregation and not specifically for inmates who had

6  participated in riots.  Evans Decl. ¶ 22.  There was a need to keep white B-facility inmates from

7  white C and D facility inmates because C and D facility inmates viewed B-facility inmates as "no

8  good" unless they assaulted a black inmate or another white inmate identified as "no good." Id.

9  ¶ 21.  This circumstance stemmed from an incident in 1997 where B-facility inmates failed to

10  retaliate when a white inmate was shot to death by staff during a riot with a black inmate.  Id.

11  Defendant indicates that those who participated in riots were not necessarily moved to D7-CC4

12  and away from inmates who did not participate, because participants and non-participants "could

13  often be housed together depending on their individual case factors."  Id.[5]  Defendant says that on

14  June 20, 2002 he was not aware that any inmate who was assigned to D7-CC4 had participated in

15  the riot on April 10, 2002, or any riot.  Id. ¶¶ 31, 37.

16

17         [5]  In response to defendant's assertion that riot participants and non-participants of the
same race could be housed together based on individual case factors, plaintiff points to a

18  memorandum addressed to B facility inmates by High Desert Warden Runnels on April 17, 2002.
Magnan Decl., Ex. C.  In the memo, the warden indicates that episodes of prison violence had
occurred because certain inmates had adopted a philosophy of "My Race":  "Simply put, the

19  philosophy appears to mandate that all individuals of a race involve themselves in violence
when/if a violent act is perpetrated upon any individual of the race by an inmate of another race."

20  Id.  In a Supplemental Declaration, plaintiff attempts to authenticate this memorandum to satisfy
Rule 901 of the Federal Rules of Evidence.  See Docket No. 178.  However, the supplemental

21  declaration is unsigned and thus the April 17, 2002 memorandum cannot be considered.  See
Local Rule 131(b).   See also Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir.

22  2002).  Defendant also objects to the warden's memorandum as irrelevant because plaintiff has
failed to demonstrate defendant was aware of its contents, though defendant does not specifically

23  state he never saw the memo.  See Objections To Pl.'s Evidence, Objection No. 2 (Docket No.
187).  If the memo were otherwise admissible, this objection is not well taken.  The warden's

24  memo makes it more likely that defendant was aware of the "My Race" philosophy and that
violence had been caused by adherence to that policy.  That evidence would reinforce other

25  evidence of record on the instant motion suggesting that defendant was aware that some inmates
intended harm to plaintiff based on his nonparticipation in the Spring 2002 riots.

26

1    Defendant does admit that inmate McCormick had been on D7-CC4 before

2    plaintiff was assigned there, but says he was moved off before plaintiff was assigned to that yard.

3    Id. ¶ 29.

4    The CDC 128(G) form documenting the June 20, 2002 ICC hearing states that

5    plaintiff had developed "enemy concerns" because he did not participate in the February 15, 2002

6    and April 10, 2002 riots.  Id., Ex. C.  The memo also says B yard "issues" "would follow

7    [plaintiff]" such that he should be transferred to another prison.  Id.  Defendant and the other

8    committee members still believed D7-CC4 was a good fit for plaintiff in part, because it had

9    been "evaluated extensively by staff."  Id.

10    Plaintiff asserts in his declaration that he did not "agree" with the decision to

11    place him on D7-CC4 despite what appears in the CDC 128(G) form completed after the hearing.

12    Magnan Decl. ¶¶ 51-52.

13    Plaintiff and inmate Holtsinger were attacked on D7-CC4 on June 22, 2002;

14    plaintiff was attacked by inmates Davis and Sidley specifically.  Def.'s Undisputed Fact No. 55;

15    Pl.'s "Separate Statement of Genuine Issues . . ." (Docket No. 178) (not disputing No. 55).

16    Plaintiff says he and Holtsinger arrived at the yard three minutes after all the other inmates were

17    already assembled there, and they were attacked almost immediately.  Magnan Decl. ¶¶ 62-64.

18    Inmate Davis and another inmate who attacked inmate Holtsinger were listed,

19    along with plaintiff, in the confidential memorandum reviewed by defendant in connection with

20    the June 20, 2002 ICC hearing as targets for attack.  Evans Decl. ¶ 30.  In his declaration,

21    plaintiff counters the inference to be drawn from defendant's declaration -- that the known risk to

22    plaintiff was narrowly circumscribed and limited to specifically identified potential attackers not

23    including Davis and Sidley.  Plaintiff asserts he was not only in danger from inmates who had

24    participated in the riots, but also inmates who did not participate who wanted to "work off" their

25    "debt" to the other white inmates.  Magnan Decl. ¶¶ 13, 15.  He also observes that the list of

26    /////

1   eight inmates in the May 31, 2002 memo he did not see or hear about on June 20, 2002, is not

2   identified as an exclusive list.  Id. ¶ 35.

3              After plaintiff was attacked, he again appeared before the ICC on June 27, 2002.

4   Magnan Decl. ¶ 70; Evans Decl., Ex. E.  Plaintiff asserts committee member Baughman

5   apologized to plaintiff and as she did, defendant nodded in agreement and said, "Sorry."  Magnan

6   Decl. ¶ 70.  Committee member Briddle said nothing.  Id.  Defendant does not remember

7   anybody apologizing to plaintiff.  Evans Decl. ¶ 40.  Plaintiff avers committee member Briddle

8   asked plaintiff if he was considering retaliation and said, if so, he should provide the committee

9   with information so that they could instead impose discipline.  Magnan Depo. at 145:11-146:4.

10  Defendant asserts he did not hear any such discussion.  Evans Decl. ¶ 40.

11             Plaintiff suggests that considering the clear risks he faced, he should have been

12  offered exercise by himself on June 20, but was not.  Magnan Decl. ¶¶ 43-44, 54.  Defendant

13  asserts that placing an inmate on "walk alone status" was not free of risk, because

14              it had the effect of identifying to inmates that there was something
             about the "walk alone" inmate about which others should be
15              concerned.  Other inmates would often view inmates in "walk
             alone" yards as being "no good."  They would treat placement on a
16              "walk alone" yard as the prison staff's confirmation of that status.
             The decision to place an inmate on a "walk alone" yard was a
17              serious one, as it virtually foreclosed the possibility of returning the
             inmate to the general population.  When there was a lack of
18              information suggesting that an inmate required "walk alone" status,
             and an inmate did not believe it was necessary and instead believed
19              he could be safely housed elsewhere, the inmate generally would
             not be placed in a "walk alone" yard.

20

21  Evans Decl. ¶ 6.  As noted, the ICC had already determined plaintiff required transfer to a

22  different institution on June 20, 2002, and the purpose of the ICC hearing on that date was to

23  determine the appropriate interim housing assignment.  Id., Ex. C.  Plaintiff was placed on walk

24  alone status after he was attacked pending final transfer.  Id. ¶ 67.

25  /////

26  /////

V.  <u>Analysis</u>

  The essential question before the court is whether there is a genuine issue of material fact as to whether defendant was deliberately indifferent to a substantial risk of serious harm that was a proximate cause of plaintiff's being attacked on June 22, 2002.  <u>See</u> <u>Leer v. Murphy</u>, 844 F.2d 628, 634 (9th Cir. 1988) (deliberate indifference must be the actual and proximate cause of the deprivation of the right to be free from cruel and unusual punishment).  It is undisputed that plaintiff was at risk on B yard, and from C and D yard inmates, unless as a riot non-participant he carried out assaults to "even the score."  The parties dispute the extent of the risk of harm on D7-CC4 yard and whether defendant was aware of the risk.

  While it is a close question, the evidence on defendant's motion does not eliminate factual disputes on the dispositive elements such that summary judgment can be granted for defendant.  There is evidence before the court from which a reasonable jury could conclude the risk to plaintiff was substantial.  The May 30, 2002 confidential memorandum attached to defendant's declaration indicates plaintiff was at risk of being stabbed because he was viewed as "no good," or, in other words, had been unwilling to participate in prison riots. Although defendant suggests he did not think anyone placed on D7-CC4 yard as of June 20, 2002, had participated in a riot, he concedes that inmate McCormick, a riot participant, had exercised on D7-CC4 before plaintiff was assigned there.  A reasonable inference could be drawn that McCormick, the author of the "hit list," could have encouraged other inmates to attack plaintiff even if McCormick himself was not present.  An inference can also be drawn that inmates on D7-CC4 yard knew plaintiff was a non-participant in the riots, given plaintiff's testimony about the manner in which prison officials conducted the disciplinary hearings following the April 10, 2002 riot, with the result that the inmate population knew generally whose charges of rioting were dismissed and who thus were targets for attack.

  There also is evidence before the court from which a jury could conclude defendant was aware on June 20, 2002 of the substantial risk to plaintiff.  He reviewed the

confidential memorandum at the June 20 ICC hearing, and as noted admits he was aware inmate McCormick had been housed on D7-CC4 before plaintiff was transferred there. The record of the ICC hearing documents the ICC's conclusion that plaintiff's enemy concerns would "follow him" off of B yard and that the only way to remedy those concerns was to transfer him to a different prison.

As for whether defendant was aware there were white inmates on D7-CC4 who had participated in the Spring 2002 riots, the June 20, 2002 ICC memorandum indicates that D7-CC4 had been "evaluated extensively." From this, a reasonable fact finder could draw the inference that defendant was made aware on June 20 of the riot history of the inmates on D7-CC4. Again, while defendant says he was not aware of any inmate with a history of rioting residing on D7-CC4 on June 20, plaintiff says he was at risk not just from those who had rioted but other targets of attack seeking to get off a "hit list." While defendant indicates "walk alone" status would not have been a viable alternative for plaintiff on June 20, because it presented its own set of long term problems, plaintiff was already destined for transfer to another institution as of June 20. As indicated above, plaintiff was given "walk alone" status after he was attacked, for the interim period before his transfer could be effected.

Generally, defendant concedes he does not remember clearly details of plaintiff's hearing; his failure to recollect does not allow the court to give him the benefit of the doubt on summary judgment. See, e.g., Shawmut Bank, N.A. v. Kress Associates, 33 F. 3d 1477, 1501& n.24 (9th Cir. 1994).

For the foregoing reasons, there is sufficient evidence in the record such that a jury is required to resolve the factual disputes relevant to resolution plaintiff's claim. Defendant's motion for summary judgment should be denied.

VI. Qualified Immunity

Defendant also argues he is immune from suit with respect to plaintiff's first cause of action in light of the qualified immunity doctrine. Government officials performing

14

discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The court finds there are genuine issues of material fact with respect to whether plaintiff's Eighth Amendment rights were violated.  The court also finds that plaintiff's Eighth Amendment right to be protected by defendant from violence as that right is described in Farmer, 511 U.S. at 832, was clearly established at all times relevant to this case.  Defendant's qualified immunity argument should be rejected.

Accordingly, IT IS HEREBY RECOMMENDED that the motion for summary judgment brought by defendant Evans (Docket No. 153) be denied as to plaintiff's first cause of action and granted in all other respects.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  **If a party does not plan to file objections or a reply that party is encouraged to file a prompt notice informing the court as much.**

DATED:  September 22, 2010.

_____
U.S. MAGISTRATE JUDGE

1
magn1099.57(1)