1

2

3

4

5

6

7

8                     IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   PAUL MAGNAN,

11              Plaintiff,                    No. CIV S-03-1099 GEB KJM P

12        vs.

13   DAVID RUNNELS, et al.,

14              Defendants.          FINDINGS & RECOMMENDATIONS

15   _____/

16              Plaintiff is a former California prisoner proceeding with counsel with an action for

17   violation of civil rights under 42 U.S.C. § 1983.  Defendant Briddle (defendant) is a former

18   employee of the California Department of Corrections and Rehabilitation (CDCR) at High Desert

19   State Prison.  Defendant's motion for summary judgment is before the court.[1]

20   I.  Summary Judgment Standard

21              Summary judgment is appropriate when it is demonstrated that there exists "no

22   genuine issue as to any material fact and that the moving party is entitled to a judgment as a

23   matter of law."  Fed. R. Civ. P. 56(c).

24   /////

25   _____

26        [1]  Defendant Evans also has moved for summary judgment; his motion is addressed in
     separate findings and recommendations.

1

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

        If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

1  return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

2  1436 (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.

3  2d 1564, 1575 (9th Cir. 1990).

4         In the endeavor to establish the existence of a factual dispute, the opposing party

5  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

6  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

7  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

8  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

9  genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

10  committee's note on 1963 amendments).

11         In resolving the summary judgment motion, the court examines the pleadings,

12  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

13  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

14  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

15  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

16  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

17  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

18  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

19  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

20  show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

21  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

22  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

23  II.  Plaintiff's Allegations

24         While defendant seeks summary judgment with respect to all of plaintiff's claims,

25  plaintiff does not oppose summary judgement being entered with respect to any claim other than

26  /////

1   plaintiff's first cause of action.  Opp'n at 1.[2]  The following allegations from plaintiff's third

2   amended complaint, which is not verified, are related to plaintiff's first cause of action.

3           At all times relevant, plaintiff was incarcerated at High Desert State Prison and

4   defendant was employed there as a Captain.  Among his other duties, defendant was Captain of

5   the Facility B-Yard.  On February 15, 2002, a riot occurred between African-American and white

6   inmates on that yard.  A large number of prisoners were injured, most of them white.  More than

7   100 inmates participated in the riot.  Following the riot, B Facility was placed on lockdown.

8   Plaintiff, who is white, did not participate in the riot.  The fact that plaintiff did not participate in

9   the riot made him a "marked man" by members of the white gangs such as the "Aryan

10  Brotherhood" (AB), and defendant was aware of this.  On April 10, 2002, another riot occurred

11  on the B-Facility exercise yard.  Again, plaintiff did not participate.

12          About six weeks later, on May 31, 2002, an inmate named McCormick who was a

13  member of a white supremacist gang was found in possession of a "hit list" on which plaintiff's

14  name appeared.  The list also contained names of other inmates who were on the B-Facility

15  exercise yard on April 10, 2002 when the riot occurred, but who did not participate.  The list was

16  provided to defendant on May 31, 2002.  Two weeks after defendant learned of the "hit list," he

17  ordered plaintiff placed in Administrative Segregation (Ad Seg) for his own safety.

18          On June 20, 2002, plaintiff appeared before an Institution Classification

19  Committee (ICC) consisting of defendant, Correctional Officers Baughman and Nolan, and

20  Associate Warden Evans.  The ICC was convened to determine where plaintiff should be housed.

21  At the ICC hearing, plaintiff had to correct the officers' initial understanding that he had

22  participated in the April 10 riot, when he had been cleared of that charge.  The ICC members

23  were aware of inmate McCormick's "hit list."  Despite this, defendant said plaintiff would be

24  assigned to exercise on Ad Seg "Closed Compatible Yard Four," which was the same exercise

25

26          [2] Plaintiff's counsel confirmed at hearing that plaintiff opposes summary judgment as to
    this cause of action only.

1   yard for inmates who were found to have participated in the February 15, 2002 riot.  Although

2   Officer Baughman, who worked for defendant, questioned this decision, the committee

3   confirmed it.

4          On June 22, 2002, plaintiff and his cellmate Michael Holtsinger were taken to

5   "Closed Compatible Yard Four" for exercise.  When they arrived, plaintiff saw 25 white inmates,

6   all of whom had participated in the April 10 riot on B-yard.  Both plaintiff and Holtsinger were

7   attacked.  Plaintiff was knocked unconscious.  He suffered severe acute injuries as a result of the

8   attack, and suffers permanent injury as well.

9          In his first cause of action, plaintiff alleges defendant failed to protect plaintiff

10  from violence in violation of the Eighth Amendment by designating plaintiff's exercise area as

11  Closed Compatible Yard Four on June 20, 2002.  See Third Am. Compl. ¶¶ 8, 20-43, 64-70.

12  III.  Failure To Protect Standard

13         Defendant seeks summary judgment on plaintiff's claim that defendant failed to

14  protect plaintiff from violence in violation of the Eighth Amendment.  The Eighth Amendment's

15  prohibition of cruel and unusual punishment imposes on prison officials, among other things, a

16  duty to "take reasonable measures to guarantee the safety of the inmates."  Farmer v. Brennan,

17  511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)).  An

18  inmate's Eighth Amendment rights can only be violated by a prison official if that official

19  exposes an inmate to a "substantial risk of serious harm," while displaying "deliberate

20  indifference" to that risk.  Id. at 834.  An official is deliberately indifferent if he or she "knows of

21  and disregards an excessive risk to inmate health or safety; the official must both be aware of

22  facts from which the inference could be drawn that a substantial risk of serious harm exists, and

23  he must also draw the inference."  Id. at 837.

24         In the context of failure to protect an inmate from a known threat to safety,

25  deliberate indifference does not require an express intent to punish.  Berg v. Kincheloe, 794 F.2d

26  457, 459 (9th Cir. 1986).  The standard also does not require that the official believe "to a moral

certainty that one inmate intends to attack another at a given place at a time certain before that

officer is obligated to take steps to prevent such an assault.  But, on the other hand, he must have

more than a mere suspicion that an attack will occur." Id.  A prison official cannot be liable

under the Constitution for mere negligence. Davidson v. Cannon, 474 U.S. 344, 347 (1986).   In

order to avoid a finding of deliberate indifference, prison officials might show, for example:

> that they did not know of the underlying facts indicating a
> sufficiently substantial danger and that they were therefore
> unaware of a danger, or that they knew the underlying facts but
> believed (albeit unsoundly) that the risk to which the facts gave rise
> was insubstantial or nonexistent.

Farmer, 511 U.S. at 844.

IV.  Factual Record

Defendant argues he should be granted summary judgment because he had no

knowledge plaintiff would be subjected to a substantial risk of serious harm by being assigned to

Closed Compatible Yard Four when defendant participated in the decision to assign plaintiff to

that yard on June 20, 2002.  Specifically, defendant asserts there was no information indicating

plaintiff had any enemies exercising on the yard, which defendant identifies as D7-CC4.  Decl. of

Jeff Briddle in Supp. of Mot. for Summ J. (Briddle Decl.) ¶ 9.

As indicated above, plaintiff alleges defendant put him at risk by allowing him to

exercise on D7-CC4 with white inmates who had been involved in the race riots in early 2002.

The evidence before the court concerning this claim and the defense is as follows.[3]

On April 10, 2002, a riot occurred in Facility B during an "incremental unlock" of

black and white inmates.  Briddle Decl. ¶ 3.  Facility B had been on a "modified program

release" since February 15, 2002.  Id.  At the time the riot occurred there was no clear motive for

/////

---

[3]  The court relies only on evidence that satisfies standards of admissibility, and so disregards evidence for which foundation is lacking or which is otherwise objectionable.  To the extent evidence offered by plaintiff is not cited here, defendant's objections to the evidence are sustained.

1   the riot although it appeared to be a continuation of "interracial conflict" that had occurred for

2   more than a year. Id. Facility B went back on lockdown on April 19, 2002. Id.

3         Plaintiff avers that as a result of an earlier riot, which occurred on February 15,

4   2002, there was an expectation among the inmate population that white inmates should exact

5   reprisals against both black inmates and white inmates who did not participate in the riot. Decl.

6   of Paul Magnan in Opp'n to Mot. for Summ. J. (Magnan Decl.) ¶ 15. Plaintiff also says that

7   defendant and a correctional lieutenant approved inmate councils to select the white inmates who

8   would be released in the "incremental unlocks" that defendant describes. Id. ¶¶ 22-24. Plaintiff

9   was one of the inmates selected for release, and as a result he was on the yard on April 10, 2002,

10   but did not participate in the riot that day. Id. ¶¶ 25, 27-28. Although plaintiff was charged with

11   rioting on April 10, those charges were dismissed. Id. ¶¶ 31-33.

12         Plaintiff says that the inmate population generally learned who did not participate

13   in the April 10 riot because of the manner in which disciplinary hearings for the riot were held:

14         When the day came for the hearings to be held for the white
         inmates, groups of 4 or more inmates were chained together and

15         brought down to the Facility B operations center, and a group of
         approximately 20 inmates was held outside the Lieutenant's office,

16         which had windows through which all of the inmates could
         observe the hearings, and inmates closest to the door could hear

17         what was being said in the office and announced what was
         occurring in the hearings and some inmates announced whether

18         they were found guilty upon emerging from the hearing, so that all
         inmates knew what the results of the hearing were.

19

20   Id. ¶¶ 32-32A.

21         Plaintiff also describes a memo sent following the April 10 riot, on April 17,

22   2002, by the warden of High Desert to Facility B inmates. Id. ¶ 11. Plaintiff says the memo

23   identified the driving force behind the then-recent riots as the adherence by Facility B inmates to

24   a philosophy that mandated all inmates of a particular race to involve themselves in retaliatory

25   violence once a violent act was perpetrated on any member of that race by an inmate of another

26   /////

1   race.  Id.[4]  As noted, plaintiff himself confirms the existence of a "policy" whereby inmates were

2   expected by members of their own race to involve themselves in race riots or face punishment in

3   the form of attacks by members of their own race.  Id. ¶¶ 11-13, 15.  He also provides the

4   declaration of another inmate who says the same thing.  Declaration of Michael Holtsinger in

5   Supp. of Opp'n to Mot. for Summ. J. (Holtsinger Decl.) ¶¶ 9, 11.

6          On June 14, 2002, plaintiff was placed in Ad Seg.  Briddle Decl. ¶ 4.  An exhibit

7   attached to defendant's declaration indicates plaintiff was told he was being moved to Ad Seg

8   based on information suggesting plaintiff's life was in danger in Facility B.  Id., Ex. B.  Inmate

9   Holtsinger also was placed in Ad Seg with plaintiff.  Magnan Decl. ¶ 38.  Plaintiff says he

10  understood he and Holtsinger were placed in Ad Seg because they were in danger of being

11  attacked by other white inmates.  Id.  On June 14, 2002, plaintiff was escorted to Ad Seg with

12  inmates Fowler, Cable and Holtsinger.  Id. ¶ 39.  The correctional officer escorting the inmates

13  predicted that two of the four inmates would be stabbed.  Id. ¶¶ 38-39.

14         On June 17, 2002, defendant conducted an administrative review of plaintiff's Ad

15  Seg placement.  Briddle Decl. ¶ 4 & Ex. A.  At the time of the review, plaintiff declined

16  witnesses and waived his right to 72 hours' preparation time.  Id.  Defendant decided to retain

17  plaintiff in Ad Seg pending ICC review.  Id.  Plaintiff says defendant did not offer him "walk

18  alone" status, where plaintiff would exercise alone or only with his cellmate, or assignment to a

19

20        [4] Plaintiff attaches a copy of the April 17, 2002 memo to his declaration.  In a
    Supplemental Declaration, plaintiff attempts to authenticate this memorandum to satisfy Rule
    901 of the Federal Rules of Evidence.  See Docket No. 178.  However, the supplemental

21  declaration is unsigned and thus the April 17, 2002 memorandum cannot be considered.  See
    Local Rule 131(b).  See also Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir.

22  2002).  Recently, following the filing of findings and recommendations regarding defendant
    Evans's motion for summary judgment, see note 1 supra, plaintiff's counsel filed a signed copy

23  of the declaration, saying he simply filed the unsigned copy in error.  While the undersigned does
    not consider the signed declaration, as it was not part of the record on defendant's motion at the

24  time of submission, consideration would not change the result recommended here.  If the memo
    were admissible, it would only make it more likely that defendant was aware of the "My Race"

25  philosophy and that violence had been caused by adherence to that policy.  That evidence would
    reinforce other evidence of record on the instant motion indicating defendant was aware that

26  some inmates intended harm to plaintiff based on his nonparticipation in the Spring 2002 riots.

1   "special needs" yard.  Magnan Decl. ¶ 43; see also Briddle Decl.  ¶ 16 (defining "walk alone"

2   status).  Plaintiff also says he understood defendant kept plaintiff in Ad Seg pending defendant's

3   verification of confidential information and discussions with confidential informants.  Magnan

4   Decl. ¶ 43.  At the time of the review, defendant did inform plaintiff generally that threats to his

5   life had been made by B Facility inmates and confidential information indicated white B Facility

6   inmates had conspired to stab plaintiff and inmate Holtsinger.  Id. ¶ 44.

7          The ICC review was conducted on June 20, 2002.  Briddle Decl. ¶ 6.  At the start

8   of the hearing, committee member Evans began by noting incorrectly that plaintiff had been

9   found guilty of participating in the April 10, 2002 riot and, as a result, plaintiff would be sent to

10  the Pelican Bay State Prison Security Housing Unit and assessed a 10 point reduction in his

11  classification score.  Magnan Decl. ¶ 45; see also Briddle Decl., Ex. B (top of exhibit identifies

12  plaintiff's classification score as 68 reflecting an anticipated ten point reduction); cf id. (reference

13  to 58 point score actually assigned, at end of narrative discussion).  After plaintiff insisted he had

14  not been found guilty of rioting, committee member Baughman searched plaintiff's file and

15  found documentation that confirmed plaintiff's position.  Magnan Decl. ¶ 48.  Only then did

16  Briddle confirm the same.  Id.  Baughman then said, "It's a good thing you said something."  Id.

17  Baughman then passed around a confidential folder for members of the ICC to review.  Id.

18         The committee did consider a confidential memorandum dated May 31, 2002,

19  which was based on information provided by an inmate informant.  See Briddle Decl., Ex. B.  In

20  the confidential memorandum, plaintiff and other inmates then residing in B-Facility, including

21  inmate Davis who later attacked plaintiff, were identified as targets of attack by other specifically

22  identified B-Facility inmates.  Briddle Decl. ¶¶ 7, 15.  It appears the inmates were targets because

23  they did not participate in the April 10, 2002 riot.  Id. ¶ 7.  Defendant asserts the memo identified

24  seven inmates that would attack plaintiff if they could.  Id.  Plaintiff describes the memo, which

25  he saw only after June 22, 2002, as identifying "at least" eight inmates who were prepared to

26  attack plaintiff.  Magnan Decl. ¶ 35.

1  Ultimately, the ICC concluded that plaintiff was in fact at risk in B Facility

2  because "other inmates . . . believed he did not fight in the April 10, 2002 riot," and because the

3  May 31, 2002 confidential memo identified potential enemies of plaintiff.  Briddle Decl. ¶ 7.

4  The committee also concluded that if plaintiff were released to "certain areas" of the prison or a

5  "180 yard,""enemy concerns" developed in B Facility would "follow him" and he might be

6  attacked.  Id. ¶ 8 & Ex. B.  In light of these facts, the committee determined plaintiff should be

7  transferred to another prison.  Id.

8  Given the procedures required to effect a transfer, it could take up to two weeks

9  for a transfer to be presented to a Classification Staff Representative (CSR) for review.  Id. ¶ 8.

10  The CSR then would determine where an inmate would be transferred.  Id.  Considering that

11  transfer could take up to ten weeks to be effected, the ICC determined plaintiff would be retained

12  in Ad Seg housed with Holtsinger, and assigned to D7-CC4 for exercise pending the transfer.  Id.

13  & Ex. B; see also Magnan Decl. ¶¶ 49-50.  When defendant proposed plaintiff's housing

14  assignment, plaintiff says committee member Baughman said to defendant, "Are you sure – I

15  don't want to get sued and lose my house."  Magnan Decl. ¶ 49.  Defendant, who was

16  Baughman's supervisor, told Baughman,"It's okay, he's one of them."  Id.; see also Briddle Decl.

17  ¶ 20.

18  Defendant provides a copy of the memorandum documenting the ICC's June 20,

19  2002 hearing.  Briddle Decl. ¶ 6 & Ex. B.  Plaintiff does not dispute that the memorandum relates

20  to the ICC decision, but he disagrees with some of the document's content.  Magnan Decl. ¶ 51.

21  For instance, plaintiff says he did not agree with the decision to place him in D7-CC4 despite

22  what the document says.  Id. ¶¶ 51-52; cf. Briddle Decl. ¶ 11 (noting memo says plaintiff did

23  agree).  Plaintiff also asserts he had no reason to object to his move to D7-CC4 because he was

24  not made aware of any specific threats to him on that yard before he was attacked.  Magnan Decl.

25  ¶¶ 53, 69.  Shortly after he was attacked, plaintiff did learn he had been on a "hit list" found

26  /////

1    before the attack in the possession of inmate McCormick; he learned through a "kite" sent to him

2    from an unidentified inmate.  Tr. of the Depo. of Paul Magnan (Magnan Depo.) at 108:8-110:2.

3         It is not disputed that plaintiff was attacked on June 22, 2002, by inmates Davis

4    and Sidley.  Def.'s Undisputed Facts Nos. 38, 40; Pl.'s "Separate Statement of Genuine Issues

5    . . ." (Docket No. 178) (not disputing No. 55).  Plaintiff and inmate Holtsinger were the last

6    inmates released to D7-CC4 that day, after the other inmates already were assembled; they were

7    attacked within three minutes of their release onto the yard.  Magnan Decl. ¶¶ 62-64.  Defendant

8    was not on the D7-CC4 yard when plaintiff and Holtsinger were attacked and he did not

9    supervise the officers that restored order on the yard.  Briddle Decl. ¶ 16.

10        Inmate Davis and another inmate who attacked inmate Holtsinger were listed,

11   along with plaintiff, in the confidential memorandum reviewed by defendant in connection with

12   the June 20, 2002 ICC hearing as targets for attack.  Id. ¶ 15.  In his declaration, plaintiff counters

13   the inference to be drawn from defendant's declaration -- that the known risk to plaintiff was

14   narrowly circumscribed and limited to specifically identified potential attackers not including

15   Davis and Sidley.  Plaintiff asserts he was not only in danger from inmates who had participated

16   in the riots, but also inmates who did not participate who wanted to "work off" their "debt" to the

17   other white inmates.  Magnan Decl. ¶¶ 13, 15.  As noted, he also observes that the list of inmates

18   in the May 31, 2002 memo he did not see or hear about on June 20, 2002, is not identified as an

19   exclusive list.  Id. ¶ 35.

20        After plaintiff was attacked, the same ICC reconvened on June 27, 2002, to

21   discuss plaintiff's housing assignment.  Briddle Decl. ¶¶ 17-18.  Defendant says that plaintiff said

22   at the hearing that he was in good health and understood his current housing assignment.  Id. ¶

23   17.  Plaintiff says committee member Baughman said to plaintiff at the hearing, "We owe you an

24   apology–we made a big mistake," while defendant said nothing.  Magnan Decl. ¶ 70.  As noted,

25   the ICC confirmed the decision it had made already on June 20, that plaintiff should be

26   transferred to another prison; defendant describes the June 27 decision as allowing plaintiff to

1   "get a fresh start."  Briddle Decl. ¶ 18.  Until the transfer could be effected, the committee

2   ordered that plaintiff be placed on "walk alone" status for exercise.  Id.

3          Defendant says that in his 26 year career he has investigated hundreds of incidents

4   where inmates were specifically targeted for assault by other inmates.  Id. ¶ 13.  He also says

5   there is always a general risk to inmates while they are in prison and that risk is inherent if one is

6   incarcerated.  Id. ¶ 12.

7   V.  Analysis

8          The essential question before the court is whether there is a genuine issue of

9   material fact as to whether defendant was deliberately indifferent to a substantial risk of serious

10  harm that was a proximate cause of plaintiff's being attacked on June 22, 2002.  See Leer v.

11  Murphy, 844 F.2d 628, 634 (9th Cir. 1988) (deliberate indifference must be the actual and

12  proximate cause of the deprivation of the right to be free from cruel and unusual punishment).

13         While it is a close question, the evidence on defendant's motion does not

14  eliminate factual disputes on the dispositive elements of plaintiff's claims such that summary

15  judgment can be granted for defendant.  There is evidence before the court that there was

16  substantial risk of serious harm to plaintiff from exposure to white inmates generally at High

17  Desert in June 2002.  Both plaintiff and inmate Holtsinger aver they were targets of attack by

18  other white inmates at High Desert because they did not participate in the riots in early 2002.

19  Both inmates describe the warden's confirming the existence of a "policy" whereby all B Facility

20  inmates were expected to involve themselves in violence if a member of their race was attacked

21  by a member of another race.  As of May 31, 2002, confidential information had been gathered

22  indicating plaintiff was directly targeted by seven, eight and possibly more inmates for not rioting

23  in support of other white inmates.  Defendant was privy to the information; plaintiff was not.

24         A reasonable jury could draw the inference that it also was common knowledge

25  throughout the prison that plaintiff did not riot on April 10, 2002 because of the public manner in

26  which inmates including plaintiff were found not guilty of rioting.  Such an inference is further

12

1   supported by the warning from the correctional officer who escorted plaintiff and inmate

2   Holtsinger to Ad Seg on June 14, 2002, who asserted the two inmates were among possible

3   targets for attack.

4            At the administrative review of plaintiff's Ad Seg placement on June 17, 2002,

5   defendant confirmed the placement pending ICC review.  There is evidence indicating defendant

6   told plaintiff of defendant's own plans to verify the confidential information regarding plaintiff

7   and to have discussions with confidential informants.

8            The members of the ICC, including defendant, admitted plaintiff was in danger in

9   areas of the prison other than B Facility when they met on June 20, 2002.  They specifically

10  found that issues that arose in B Facility would follow him to "certain areas" of the prison and to

11  any "180 yard."  This is why they concluded that plaintiff needed to be transferred to another

12  institution.

13           There is evidence in the record that defendant was the ICC member who proposed

14  plaintiff's housing assignment to Ad Seg and D7-CC4.  No member of the ICC, including

15  defendant, proposed offering plaintiff "walk alone" status.  Knowing the nature of the risks to

16  plaintiff, an inference could be drawn from the failure to offer plaintiff  "walk alone" status that

17  the members of the ICC, including defendant, were indifferent to any harm plaintiff might befall.

18  Rather, plaintiff was given "walk alone" status only after he was attacked.  Additionally, the

19  record contains evidence from which a jury could conclude plaintiff was never informed of

20  meaningful details of the threat against him.  Had he been informed, there would be no question

21  but that plaintiff could or should have asked for "walk alone" status, sought an expedited

22  transfer, appealed the ICC decision to place plaintiff on D7-CC4, or simply refused to go to that

23  exercise yard.  The evidence suggesting the committee, of which defendant was an active

24  member, did not inform plaintiff of the exact nature of the threat against plaintiff so that he could

25  better protect himself also could support a reasonable jury's conclusion that defendant either

26  intended plaintiff harm, or did not care if he was harmed.  While defendant points to the status of

1   one of plaintiff's attackers as a target of attack himself, and says he thus could not have known of

2   the risk the attacker posed before June 22, plaintiff says targets of attack had an incentive to

3   initiate attacks so as to remove the target from their backs.

4        Finally, it is undisputed that defendant was not working the D7-CC4 yard on June

5   22, 2002 and that he did not supervise the restoration of order on that yard after the attack.  While

6   defendant's physical absence from the scene of the attack could tend to relieve him of liability,

7   there is sufficient other evidence in the record from which a jury could conclude that defendant's

8   actions or omissions were instrumental in creating an environment in which plaintiff's attack was

9   entirely predictable.

10        It is not for the court to resolve these questions, close as they are; rather they are

11   the province of a jury.  For the foregoing reasons, defendant's argument that he should be granted

12   summary judgment on plaintiff's first cause of action should be rejected.

13   VI.  Qualified Immunity

14        Defendant also argues he is immune from suit with respect to plaintiff's first

15   cause of action under the qualified immunity doctrine.  Government officials performing

16   discretionary functions generally are shielded from liability for civil damages insofar as their

17   conduct does not violate clearly established statutory or constitutional rights of which a

18   reasonable person would have known.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The

19   court finds there are genuine issues of material fact with respect to whether plaintiff's Eighth

20   Amendment rights were violated.  The court also finds that plaintiff's Eighth Amendment right

21   to be protected by defendant from violence as that right is described in Farmer, 511 U.S. at 832,

22   was clearly established at all times relevant to this case.  Defendant's qualified immunity

23   argument must be rejected.

24        Accordingly, IT IS HEREBY RECOMMENDED that defendant Briddle's motion

25   for summary judgment (Docket No. 145) be denied as to plaintiff's first cause of action and

26   granted in all other respects.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez  v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).  **If a party does not plan to file objections or a reply that party is encouraged to file a prompt notice informing the court as much.**

DATED:  September 28, 2010.

_____
U.S. MAGISTRATE JUDGE

1
magn1099.57(B)